## Linderman Box & Veneer Company v. Charles Thompson.

### Gen. No. 12,474.

1. BILL OF EXCEPTIONS—*right of successor of trial judge to pass upon.* It is the right and duty of the successor of the trial judge to settle and sign a bill of exceptions not settled and signed by such trial judge.

2. PEREMPTORY INSTRUCTION—*when should not be given.* A case should not be taken from the jury by a peremptory instruction for the defendant unless there is no evidence which, if true, with all the inferences and intendments reasonably to be drawn from it, would support a verdict for the plaintiff.

3. ASSUMED RISK—*when question of law for the court.* Under the facts of this case the question of whether plaintiff had assumed the risk was one of law for the court.

4. ASSUMED RISK—*when doctrine of, applies.* A specific order, if it is to do work incident to the service for which a servant is hired in a way usual to him, does not take a case from the operation of the rule concerning "assumption of risk."

Action on the case for personal injuries. Error to the Superior Court of Cook County; the HON. JONAS HUTCHINSON, Judge, presiding. Heard in this court at the October term, 1905. Reversed, with finding of fact. Opinion filed May 21, 1906.

**Statement by the Court.** This writ of error is prosecuted to secure the reversal of a judgment rendered in the Superior Court of Cook County, November 28, 1903, in favor of the defendant in error, plaintiff below, against the plaintiff in error, defendant below, for $1,000.

The suit was begun for the defendant in error as a minor by his mother as his next friend, but on the trial, the plaintiff having attained his majority, an order was entered striking out the name of the next friend from all pleadings and allowing the cause to proceed in the name of Charles Thompson.

The declaration, which was in one count, alleges that on July 22, 1898, the defendant operated a box factory in Chicago and certain wagons in connection therewith, and had the plaintiff and other persons there subject to the

orders of a foreman.   That it had three duties: *first,* not
to employ any child between fourteen and sixteen years
old in said factory, unless there was first placed on file an
affidavit made by the parent or guardian of such child
stating the age, date and place of birth of such child;
*second,* to exercise proper care in maintaining a reasonably
safe roadway there, and in maintaining in good order and
in operating said wagons; and *third,* not to employ there
any child under fourteen years of age.   It then alleged a
violation of each of said duties, and as to the second
averred that the defendant maintained its wagons in such
bad order and operated the same so negligently and main-
tained the roadway there in such bad and poor, uneven and
cut up condition, that the plaintiff, who was an employee of
the defendant, and was a child of less than sixteen years,
and was directed by the foreman to assist in moving one of
the wagons by hand along said roadway to a point opposite
said door, and to take the pole of said wagon, and was not
informed of the danger of said service, and with due care
assisted in moving the wagon as directed, without any
want of care on the part of his fellow-servants, had his
right hand caught between two of said wagons and lost
the third finger of it thereby.

To this declaration the general issue was filed.   The
cause was submitted to a jury, who returned a verdict for
the plaintiff for $1,000, and made the special findings that
the plaintiff was not guilty of any negligence that con-
tributed to cause the injury, and that he did not, at the
time of the injury, know of and appreciate the danger from
which it arose.

Judgment was entered on the verdict after the denial of
a motion for a new trial and of one in arrest of judgment.

In this court assignments of error by the plaintiff are
argued, involving propositions that the court should
have directed a verdict for the defendant at the conclusion
of the evidence, that the verdict was against the clear pre-
ponderance of the evidence on the question of the defend-
ant's negligence, on the questions of due care and contribu-

tory negligence of the plaintiff, and on the question of the assumption of risk by the plaintiff; that there was a fatal variance between the declaration and the proof introduced in support of the allegation that plaintiff was inexperienced and ignorant of the dangerous condition which gave rise to his injury; that the trial court committed reversible error in refusing to submit certain special interrogatories to the jury, and in giving and in refusing certain instructions.

Cross-errors have been assigned by the defendant in error, relating to the signing, sealing and filing of the bill of exceptions tendered by the defendant.

The Hon. Jonas Hutchinson, before whom the cause was tried, entered judgment upon the verdict November 28, 1903. An appeal was prayed by the defendant and allowed and thirty days given to defendant to file a bond and a bill of exceptions. Within said period, on December 17, 1903, Judge Hutchinson died, without having signed and sealed the bill of exceptions. December 28, the time for filing an appeal bond was extended five days, and for a bill of exceptions twenty days. The appeal was not perfected, but on January 14, 1904, the time for filing bill of exceptions was extended ten days, thus including January 27, 1904. On that day a bill of exceptions was presented by the defendant to the Hon. Elbridge Hanecy, who had been duly appointed and qualified as the successor of Judge Hutchinson. He signed and sealed the same, and it was filed. This was over the plaintiff's objections that the draft of the bill of exceptions presented was not correct in certain specified particulars, and that the defendant had not proved nor offered to prove its correctness in general or in said specified particulars.

The court ruled, first, that the burden of proof was on the plaintiff to establish by evidence the existence of the error that he claimed existed, and, second, that the alleged omissions and errors in said draft were immaterial. To these rulings the plaintiff preserved exceptions by a bill of exceptions made part of the record, which recited also that

no evidence was taken by either party as to the alleged errors in the defendant's bill of exceptions, and that Judge Hanecy had no knowledge of anything which occurred in the case prior to Judge Hutchinson's death.

O. W. DYNES, for plaintiff in error.

I. T. GREENACRE, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

The facts out of which this suit grew are these: The defendant in error, who was plaintiff below, and will be in this opinion so called, was on July 22, 1898, a youth in his seventeenth year. This at least is the nearest approach to certainty concerning his age which the record shows. His counsel in their argument say he was one week under sixteen. He had worked for the plaintiff in error, called hereafter the defendant, for the two years before that date. The defendant was a corporation operating a box factory on Goose Island in Chicago. On its premises it had a driveway, leading through a shed or under a roof erected over and opposite a loading platform. This driveway was rough and evidently made of cinders, sawdust, pieces of brick and other chance material, as well as dirt. It undoubtedly had many holes in it and was far from being a model roadway. It was used, however, in this condition, with some patchings and repairs, for the two years that the plaintiff was employed. Wagons returning to the factory would approach the loading platform from the south. The horses would be unhitched at some distance south of the platform, and the wagon there dropped for the time. The horses would then be taken north of the platform, hitched to a loaded wagon, and driven away with it. The place of the loaded wagon at the loading platform would then be taken by an unloaded wagon before left south of the platform, and this wagon would in turn be loaded and hauled away. These empty wagons would be pulled or pushed up to the loading platform by hand, a considerable number of men and boys generally joining in

the necessary effort.   It would appear also that a wagon after loading, if the horses were not ready to draw it away, would be pushed along by hand by the same helpers to some distance north of the platform, to make room for the unloaded wagon at the platform.   This course of things was of such constant recurrence that the plaintiff several times a day during his employment, or at least for several months preceding July 22, 1898, had taken part with his fellow-workmen in pushing or pulling unloaded wagons to the platform, and it may safely be presumed, in pulling loaded wagons to a short distance north of the door. (Abst. 39, rec. 103.)

July 22, 1898, just after the noon luncheon hour, it being time to go to work again, several of the men or boys—the witnesses vary in their estimates of the number from six to fifteen—were called on by the foreman, apparently in a usual and habitual manner, to pull a double unloaded wagon to the platform.   This wagon was about fifty feet south of the platform.   A single loaded wagon stood about twenty feet north of the platform.   It had been pulled or pushed there just before the noon hour after having been loaded at the platform.   The plaintiff himself says that he did not help to pull or push the loaded wagon away from the platform, and therefore had nothing to do with placing it where it was.   In this statement he is directly contradicted by his elder brother, who was also a workman at the factory and accustomed to help in moving the wagons. This brother says that the same people, the plaintiff among them, who pulled the double unloaded wagon to the platform had pulled the single loaded wagon away.   However that may be, when the double unloaded wagon was ordered to the platform by the foreman, a dozen or so of the workmen, the plaintiff among them, seem to have seized it, some of them pushing and some pulling or guiding the pole.   The plaintiff took hold of the pole or tongue and was at the end of it, walking backward with his hand over the "eye" or end of the pole, for the purpose of guiding the course of the wagon.   The foreman seems to have

given his orders or instructions concerning this wagon within the shop as soon as the whistle blew for the resumption of work, and certainly was in the shop and near the engine when the men were actually pushing up the wagon.  There is evidence, however, that he said to the plaintiff, "You take the pole", or "You guide the tongue", or something to that effect, and although this is contradicted by him, it must be considered by us in the view that we take of the proper disposition of the case, as established.  It appears, however, that it was usual for the younger or lighter boys to take the pole and for the stronger and heavier ones to push behind or on the wheels. The plaintiff himself says that he had often guided the pole before, that "anybody used to get hold of the pole, any of the young fellows; the big fellows used to get in back to push it up"; that the foreman "usually told him to get hold of the pole, to guide the pole."  The order does not seem, therefore, to have been special or specific in any significant sense, but to have amounted to an instruction to go on as usual in the ordinary and habitual course of work.

The axles of the two wagons, the loaded single and the unloaded double, were at about the same height, and the pole or tongue of one when the wagon was at rest would naturally dip a little downward, so that it could be made to run under the body of the other.  The road had a slight down grade from the south for about a rod to the platform, from which to the north it was level or with a slight ascent.  As the plaintiff's brother expresses it, " As soon as we struck that grade the wagon commenced to go fast. When it commenced to go fast and struck the grade, he" (the plaintiff) " went in front of it.  I yelled at him to look out and he twisted around over so that it would not go into his stomach, and the eye of the pole struck on his hand and the back of the other wagon."

The plaintiff's right hand was thus pinched between the point of the tongue of the double wagon and the tailboard of the single wagon, and so injured that amputation of the

third finger became necessary. The other fingers were stiffened and the plaintiff was for a long time unable to work.

The evidence tended to show that the pole or tongue flew up and thus hit the tailboard of the wagon, instead of going under its body, because of the uneven condition of the road, and in particular because of a hole or rut about a foot deep, filled with water, immediately in front of the platform. When the front wheel of the rear wagon ran into this rut, the steering became, it is claimed, difficult, and the wagon swayed so that the pole flew upward.

The plaintiff's testimony about this is: "The road was all full of holes all around there. It was hard to guide a pole anywhere around there. We used to pick up some brick along the line and fill in, and I used to bring out sawdust and dump in the holes. * * * We filled it up to make the road smoother, so that the wagons would not jerk around any. * * * The hole midway in front of the door had been there ever since the place was put up, up to the time I was hurt. It was about a foot deep, and had mud and water in it."

We think that the evidence shows clearly enough the circumstances and nature of the accident, and that there is really no ground for any serious dispute as to the facts. As to the effect of them upon the claim that the defendant is liable to the plaintiff for the accident, we differ from the view taken by the trial court. We think that the instruction directing a verdict for the defendant, asked for at the conclusion of all the evidence, should have been given.

This conclusion renders it unnecessary to discuss many of the matters involved in the arguments of the parties before us.

The cross-errors assigned by the defendant in error need no detailed discussion, for there can of course be no doubt of the right and duty of Judge Hutchinson's successor to pass on the bill of exceptions presented to him (The People v. McConnell, 155 Ill. 192; The People v. Higbee, 172 Ill. 251; Village of Hinsdale v. Shannon, 182 Ill. 312), and if

Linderman Box & Veneer Co. v. Thompson.

the bill had been amended according to the plaintiff's demands in all the respects in which it was claimed to be deficient or inaccurate, the result of our consideration of the cause would not have been altered. In other words, as Judge Hanecy held, the alleged errors and omissions in the bill of exceptions as presented were immaterial. We do not think it necessary to decide that Judge Hanecy's ruling as to an abstract proposition of law " that the burden of proof was upon the plaintiff to establish by evidence the existence of such errors as he claimed existed in the draft of the bill of exceptions presented by the defendant, and not upon the defendant to prove by evidence the correctness of the statements contained in the draft," was accurate, in order to dispose of the prayer to strike the bill of exceptions from the record with which the assignment of cross-errors concludes. If this were to be considered a motion for disposition, although not otherwise made or pressed, we should deny it, for Judge Hanecy signed and sealed the bill of exceptions tendered and by that act showed that he was satisfied with its recitals. It cannot be presumed that although he received no evidence, and knew nothing of his own knowledge concerning what was done in the case before Judge Hutchinson's death, that he was not in some way thus satisfied as to its correctness. Particular objections *were* pointed out by the plaintiff, who may be said to have assumed the burden of proof spoken of, and as to all these alleged imperfections, Judge Hanecy held them immaterial, in which we agree with him. The prayer at the conclusion of the alleged cross-errors, however, has not been formulated or pressed on us as a motion, and we do not consider it before us for formal disposition.

As we have held that the case should have been taken from the jury by a peremptory instruction for the defendant, it of course follows that it is not necessary to discuss any question of the preponderance of the evidence on certain points which were controverted, or to consider the various objections made by the plaintiff in error to the rul-

ings of the court on other instructions that were presented to it.

Counsel for plaintiff in error quote, as furnishing a rule to guide us in the matter of taking the cause from the jury, Simmons v. Chicago & Tomah Railway Company, 110 Ill. 340. But the rule indicated in that case is not now recognized as the correct one. The Supreme Court has laid down one stricter. A cause should not be taken from the jury by a peremptory instruction for the defendant unless there is no evidence which, if true, with all the inferences and intendments reasonably to be drawn from it would support a verdict for the plaintiff. Woodman v. Ill. Trust & Savings Bank, 211 Ill. 578; Frazer v. Howe, 106 Ill. 563; Rack v. Chicago City Ry. Co., 173 Ill. 289. We think, however, that tested even by this strict rule, the plaintiff failed to show a case which should have been allowed to go to the jury.

We do not think that there was any evidence tending to show that the proximate cause of this accident was the negligence of the defendant.

It does appear that a cinder road or a sort of composite dirt road, which was soft and uneven and had ruts and inequalities in it, was the roadway over which the wagons described in the case were run on the day of the accident and had been run for many months before. There was evidence indeed that tended to show that the condition of the road had been complained of, not, as it seems to us, because of any supposed danger lurking in it, but probably because the smoother it was made the easier the wagons would run. We do not think, however, that any condition of this road was shown which would fasten upon the defendant the liability springing from offering to their workmen " an unsafe and dangerous place to work." To hold an establishment of this kind to furnish a road free from such ruts or unevennesses that a wagon drawn or pushed by hand might not sway or throw the end of its pole higher than it would point at rest, seems to us too severe a rule. Had the loaded wagon not happened to have been standing

Linderman Box & Veneer Co. v. Thompson.

where it was, or had the momentum of the double wagon been a little less, the accident would not have happened. It seems to us a pure accident, and the result of one of the ordinary and inevitable risks which in carrying on our work in this world we are called on to face. We do not think the condition of the road, although one of the factors in this specific combination of circumstances, made the accident in reality any more likely to occur than if the road had been smooth and hard. The wagon went " too fast," the plaintiff was in an unfortunate position, and unluckily suffered. We do not think there was actionable negligence on the part of the defendant causing the injury.

But however that may be, we are clear that whatever risk there was in this work of removing the wagon from its station a rod or two south of the platform to the place where the accident occurred, was assumed by the plaintiff.

We have fully in view the doctrine that the question of assumed risk is usually and normally one for the jury, and that involved in the main question is a subsidiary one also, usually for the jury: Did the injured person understand and appreciate the risks which he is alleged to have assumed?

Nevertheless there are cases in which both the question whether the plaintiff knew of the risks of his employment, which eventuated in his injury, and the question whether he appreciated them, are answered by a conclusive presumption, and the holding that he assumed them one of law for the court, rather than of fact for the jury. Such a case we think the one at bar. The defect in the record, which is claimed to have been the proximate cause of the accident, was not concealed or latent, but patent and obvious, and known for a long time to the plaintiff; the plaintiff had experience in the handling of the wagons and of guiding the poles. The obstacle in the form of the loaded wagon was plainly before him. It was broad daylight. The danger that existed at the moment of his injury, the whole course of conduct at the establishment argues had existed many times before. Although the plaintiff was young, he was not fresh nor inexperienced in the task to

which he was set, nor of less than ordinary physical strength and intelligence for such a task. Nor do we think that there is anything in the evidence (introduced, as plaintiff's counsel said, for the purpose of showing notice of the defect in the road, not a promise to repair) that the plaintiff asked Schwartz, the foreman, apparently as a matter of curiosity rather than complaint, "when he intended to get that place filled up", that changes the situation. A specific order to do a certain thing outside of the usual ordinary routine of a workman's duties may remove a case from the doctrine of assumed risk, but in this case the order to plaintiff to "grab the pole", in connection with the orders to the rest of the gang, and the circumstances, plainly appears to have been no such order, but one to do work incident to the service for which plaintiff was hired, in a way ordinary and usual to him. It did not, therefore, affect the status of the plaintiff as to assumption of risk.

Despite, therefore, the general verdict of the plaintiff, and the special finding of the jury that Charles Thompson at the time of his injury did not know of and appreciate the danger from which his injury arose, we think that no ground appears in the evidence to sustain such verdict.

It is not necessary for us to discuss the question of variance between the evidence and the declaration argued at length by the plaintiff in error. We do not place our decision thereon, but for the reasons above given we reverse the judgment, with a finding of facts.

*Reversed.*