Mary Kath, Admx. Appellee, *vs.* The East St. Louis and Suburban Railway Company, Appellant.

*Opinion filed December 17, 1907—Petition stricken Feb. 6, 1908.*

1. Evidence—*when proof that the defendant changed conditions after accident is admissible.* If no measurements of the distance between defendant's track and the trolly-support pole against which plaintiff's intestate struck were taken until some months after the accident, it is proper, when the defendant's witnesses have testified to such measurements, to allow the plaintiff to show that the pole was moved further from the track before the measurements were taken, not as an admission of liability by the defendant, but as tending to show the location of the pole at the time of the accident.

2. Same—*when proof that crooked pole was set nearer to track than others is proper.* Proof that the trolly-support pole against which plaintiff's intestate struck was bent inward toward the track and was set closer to the track than the other poles is competent, whether the question of the distance poles should be set from the track in an overhead trolly system railroad is an engineering question or not.

3. Master and Servant—*when interurban conductor assumes risk of injury from crooked pole.* A conductor on an interurban railroad who has been over the track daily for about eight months is charged with knowledge that a certain trolly-support pole has a bend in it towards the track and that there is a depression in the track which causes passing cars to sway toward the pole, and he must be held to have assumed the risk of injury from such conditions, in the absence of any question of a promise by the company to make repairs.

4. Same—*when interurban conductor is guilty of contributory negligence.* An interurban conductor who is killed by his head striking a trolly-support pole as he leaned from the front platform of an empty car, where he was riding with the motorman, to look back at a crossing to see whether the car had run over any chick-

ens, instead of looking through the rear door, as he might have done with safety, is guilty of contributory negligence in choosing the unsafe way of performing his act.

5. SAME—*servant may assume risks due to master's negligence.* A servant assumes all hazards incident to his employment which are obvious and apparent or which are known to him, even though such conditions are produced by the master's negligence, if he continues in the employment without any promise by the master to remedy the defects.

6. INSTRUCTIONS—*when an erroneous instruction is not cured by correct one.* An instruction which positively lays down, as a rule of law, a proposition directly in conflict with the correct rule as stated in another instruction is not cured by the correct instruction, since it is impossible in such case to say which instruction was followed by the jury.

FARMER, J., dissenting; CARTER and VICKERS, JJ., specially concurring.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of St. Clair county; the Hon. R. D. W. HOLDER, Judge, presiding.

This was an action on the case commenced in the circuit court of St. Clair county by the appellee, against the appellant, to recover damages for the death of her brother and intestate, alleged to have been caused by the negligence of the appellant. A trial resulted in a verdict and judgment in favor of the appellee for the sum of $2500, which judgment has been affirmed by the Appellate Court for the Fourth District, and a further appeal has been prosecuted to this court.

The declaration contained two counts, which alleged, in substance, that the defendant, on the sixth day of December, 1904, and for a long time prior thereto, was possessed of and operating a line of electric railway in Madison and St. Clair counties, on which railway the defendant was on the said date operating certain cars for the conveyance of passengers for hire; that along its said line of railway the

defendant possessed and used a certain line of poles to support the arms to which were attached wires on which electricity was conducted for the purpose of operating its said cars; that on said day the plaintiff's intestate was in the employ of the defendant as a conductor on one of its said cars on that part of its line of railway between Maryville and Edwardsville, in the county of Madison; that it was the duty of the defendant to use reasonable care to see that its road equipment and apparatus were in a reasonably safe condition, but the defendant, not regarding its duty in that behalf, negligently caused one of its said poles a short distance north of Maryville, in the county of Madison, to be placed too near the track, and negligently permitted said pole to incline inward toward the track, and negligently permitted a low place to be and remain under the rail adjacent to said pole, which said negligent location of said pole and said low place under said rail brought the cars passing over said track in dangerous proximity to the said pole, which said condition of said pole and track was known to the defendant or should have been known to it by the use of ordinary care, but was not known to the plaintiff's intestate and could not have been discovered by him by the use of ordinary care, by reason whereof the plaintiff's intestate, while in the exercise of due care and caution for his own safety, in the performance of his duties as such conductor in charge of one of defendant's cars, in passing said pole on said line of railway, while looking out of said car in the performance of his duty, was struck by said pole and was thereby killed. The general issue was filed.

At the close of all the evidence the defendant requested the court to instruct the jury to return a verdict in its favor, which the court declined to do, and the action of the court in that regard has been assigned as error.

It appears from the evidence that Antone Kath, appellee's intestate, was on December 6, 1904, a conductor upon a car of the electric railway owned and operated by appel-

lant, running from Edwardsville, in Madison county, to
French Village, in St. Clair county. Appellant's cars were
operated by means of what is called the "overhead trolly"
system,—that is, poles were set along and near to the track
of appellant's railway, and from them arms extended out
over the center of the track from which the trolly wire was
suspended. Appellant's sheds were about a mile north of
the village of Maryville, and in these sheds its cars were
stored at night. French Village was about ten miles south
of these sheds, and between these sheds and French Village
appellant operated a car daily, called the "French Village
Special." This car would leave the sheds in the morning
for French Village and take on miners along the route for
the purpose of carrying them to the mines at or near French
Village, where they were employed, and then return to the
sheds and in the evening it would return to French Village
for the purpose of bringing the miners back from their
places of employment to their homes. The deceased entered
appellant's employment in April, 1904, as a motorman and
worked principally in that capacity but occasionally acted
in the capacity of a conductor, and was so acting at the
time he received the injury which caused his death. Wal-
ter Bruening was on that occasion acting as motorman. On
the afternoon of December 6, 1904, Bruening as motor-
man and deceased as conductor were assigned to run the
French Village Special. They were to take the car from
the Maryville sheds and go to French Village for the pur-
pose of bringing miners back to their places of residence
along the line, after which they were to return the car to
the sheds. They started from the sheds on the trip south
without any passengers, and no one was on the car at the
time of the accident except the motorman and the deceased.
As they proceeded south from the sheds both were riding
on the front platform of the car. About a half mile south
of the sheds appellant's track crossed the public highway.
A flock of chickens belonging to Mrs. Plaputnik, who lived

23 2—9

near by, were on the crossing as the car approached it. The car ran through the flock and scattered them. As it did so the deceased remarked to the motorman, "I bet you have got that rooster," and thereupon leaned out to the east from the car to look back at the crossing. The poles supporting the arms from which the trolly wires were suspended were on that side of the car, and one of them struck the deceased's head, fracturing his skull, from which injury he died.

SCHAEFER, FARMER & KRUGER, for appellant.

KEEFE & SULLIVAN, for appellee.

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

It is first contended by appellant that the court erred in allowing appellee to prove the pole which struck and injured deceased had been moved farther back from the track after the accident. If this testimony had been offered for the purpose of showing an implied admission of appellant that it was in the first place negligently set too near the track it would have been incompetent and its admission erroneous. (*Howe* v. *Medaris,* 183 Ill. 288.) No measurements appear to have been taken by any one as to the distance the pole was from the track at the time of the accident, until long after its occurrence. Appellee proved the distance between the pole and the track by witnesses who measured it in June after the accident. This appears to be the earliest date at which any measurement was taken. Appellee was allowed to prove that after the accident and before these measurements were taken the pole was moved farther away from the track. One witness testified for appellee that at the time he took the measurements, six months or more after the accident, the distance between the rail of appellant's

track and the pole was three feet and eleven inches, and another witness that it was three feet and nine inches. Appellant caused measurements to be made in October after the accident, by its employees, who were present at the trial and testified to such measurements. Their measurements corresponded substantially with the measurements made by the witnesses for appellee. The question to be determined was the location of the pole at the time of the accident, and as it had been moved before any measurements were taken it was competent to prove that fact. Just how far it had been moved was not proven. One witness testified, "They put a hole behind the pole and shoved it back;" another, that "on the east side they made a hole and moved it over." We think, in view of the fact that the pole was moved before the measurements were taken, the evidence was competent.

It is next contended that the distance poles should be set from the track of railroads operated by electricity in the manner appellant's road was operated is an engineering question. The evidence in this case tended to show that the pole with which the appellee's intestate's head came in contact was crooked and was located nearer the track than other poles in the line, and that the crook or bend in the pole extended toward the track. If, therefore, it were conceded that the distance poles should be set from the track of a railroad operated by electricity is an engineering question, it cannot reasonably be contended that setting a crooked pole nearer to the track than others in the line, and with a crook or bend towards the track, is an engineering question. It is quite clear that if a straight pole be set four feet from the track, which appellant's evidence tends to show was the usual distance, there could be no necessity for setting a crooked one nearer to the track and allowing it to incline or lean in that direction.

It is further contended that the appellee's intestate assumed the risk of being injured in the manner in which

he was injured, and that the court misdirected the jury as
to the law upon the question of assumed risk.   The evidence fairly tended to show that the pole with which Antone Kath came in contact was set nearer the track than
the other poles in the line and that it was crooked, so that
the pole, some distance above the ground, leaned towards
the track, and that opposite said pole the east ends of the
ties were rotten, so that there was a sag in the track at
that point.   The deceased had passed over said track, while
operating his car, at the point where he was injured, daily
from April to December, 1904, and in the very nature of
things must have known the situation of said pole and the
condition of said track at that point, and, knowing said
conditions, he assumed the risk of being injured therefrom.
In *Camp Point Manf. Co.* v. *Ballou*, 71 Ill. 417, the doctrine was announced, which has been frequently reiterated
by this court, that an employee cannot recover for an injury suffered in the course of the business in which he is
engaged, from the defective condition of the machinery or
appliances used therein, after he has knowledge of such defective condition, unless he continues his employment under
a promise to repair, and it has repeatedly been held that an
experienced adult employee is chargeable with knowledge
of the ordinary conditions under which the business in
which he is employed is conducted and assumes its ordinary
risks and hazards, and will be presumed to have notice of
and to have assumed all such risks and hazards which to a
person of his experience and knowledge are or ought to be
patent and obvious, (*Chicago and Eastern Illinois Railroad
Co.* v. *Heerey*, 203 Ill. 492,) and that an employee assumes
all hazards which are obvious and apparent and which are
known to him, although such conditions are produced as
the result of the master's negligence, if he continues in
his employment without a promise to remedy such defects.
*Browne* v. *Siegel, Cooper & Co.* 191 Ill. 226; *Elgin, Joliet
and Eastern Railway Co.* v. *Myers*, 226 id. 358.

The court gave to the jury the following instruction upon the question of assumed risk:

"The court instructs the jury that the servant only assumes the ordinary risks of the business,—that is, the risks which are so open and obvious that they may be discovered by the servant by the use of ordinary care,—and the servant also assumes such risks as are known to him; but the servant does not assume extraordinary risks which are unknown to him and which could not be discovered by the exercise of ordinary care, and he does not assume risks due to the master's own negligence."

This instruction was clearly wrong, in that it informed the jury that the deceased did "not assume risks due to the master's own negligence," as the authorities uniformly hold that an employee assumes all risks connected with the business in which he is employed of which he has notice, even though they are produced by the negligence of the master, if he continues in the employment; and in the form in which this instruction was given it was not cured by the instructions of the defendant which gave the correct rule to the jury upon the question of assumed risks. It positively lays down a rule directly in conflict with the correct one, and it has frequently been said in such case it is impossible to say which instruction the jury followed. *City of Macon v. Holcomb,* 205 Ill. 643.

The appellee's intestate lost his life by reason of his head coming in contact with a trolly pole situated upon the east side of the track, while he was standing upon the front part of the car with his head projected beyond the east side of the car. Two witnesses, only, saw the accident, and they differ as to the position in which the deceased stood at the time he was injured. The motorman testified the deceased stood upon the lower step upon the east side of the front part of the car; that he took hold of the car with his hands, and, facing the car, swung his body out from the car and looked towards the track in the rear of the

moving car, and while in that position his head came in contact with the pole. Mrs. Plaputnik, who was at her house, some one hundred feet west of the car, testified the deceased stood in the car and put his head out of the east front door of the car and looked toward the direction from which the car came, and while in that position his head came in contact with the pole and he fell from the car. Whichever version is correct, it is apparent the deceased's head would not have come in contact with the pole had he not placed it outside of the car. The car was running at a high rate of speed, slightly down grade, upon a straight track, in broad daylight. The deceased was familiar with the track and its surroundings and knew that the standing pole was near the east side of the track. There was no one on the car, and had the deceased desired to observe the effect of the car upon the flock of chickens he might have looked out of the rear of the car. Instead of doing so he put his head outside of the door of the car and attempted to look up the track over which the car had passed. Whether he did this out of idle curiosity, as his remark to the motorman, "I bet you have got that rooster," would indicate, or whether he was attempting to see whether the rooster had been injured, to the end that he might report such injury, if any, to the railway company, as is contended by the appellee, will never be known. Suffice it to say, that where there are two ways of performing an act, one of which is safe and the other negligent, and the servant, without coercion, chooses the negligent one, there can be no recovery if in performing the act he is injured. It has often been held that a master is not bound to take more care of a servant than the servant may reasonably be expected to take of himself. (*Pennsylvania Co.* v. *Lynch,* 90 Ill. 333; *Missouri Furnace Co.* v. *Abend,* 107 id. 44; *Karr Supply Co.* v. *Kroenig,* 167 id. 560.) The questions of assumed risk and contributory negligence are ordinarily questions of fact, but where the facts and the inferences to be

drawn therefrom are admitted they may become questions of law. There is little, if any, conflict in the evidence in this case, and if the evidence of the appellee be taken to be absolutely true, clearly it shows such a disregard by the appellee's intestate for his own safety that there exists no basis in the evidence upon which to rest a judgment against the appellant.

The judgments of the circuit and Appellate Courts will be reversed and the cause remanded.

*Reversed and remanded.*

Mr. JUSTICE FARMER, dissenting:

I agree with the opinion of the court that the instruction therein mentioned was erroneous, but I do not agree with the conclusion that, as a matter of law, deceased assumed the risk of injury or that he was guilty of contributory negligence. In my opinion, under the evidence in this case, these were questions of fact to be determined by a jury.

CARTER and VICKERS, JJ., specially concurring:

We concur in the conclusion reached in the foregoing opinion but do not concur in all that is said. We think appellee's intestate lost his life by one of the assumed risks of his employment, and we therefore concur fully with the views expressed on that subject in the foregoing opinion. In so far as it is held that appellee's intestate was guilty of such contributory negligence that no recovery can be had we dissent. We think that under the facts shown in the record the question of contributory negligence was one of fact, which having been determined in favor of appellee by the jury, and the judgment of the lower court having been affirmed by the Appellate Court, should be held conclusive upon this court. We only desire to dissent on this single question. In all other respects we concur in the opinion of the court.