Henry Stone, Plaintiff-Appellee, v. J. Pernell Guthrie and Gerald Guthrie, Defendants-Appellants.

**Gen. No. 10,111.**

Third District.

July 29, 1957.

Released for publication August 14, 1957.

.DuHadway, Suddes & Davis, of Jerseyville, for defendants-appellants.

Julian Hutchens, of White Hall, and Edward J. Flynn, of Jacksonville, for plaintiff-appellee.

JUDGE ROETH delivered the opinion of the court.
The injury which forms the basis of this suit arose out of a farming operation being the filling of a silo

with ensilage. On the day of the occurrence five persons were engaged in the operation, namely the plaintiff, the defendants who are father and son, a second son of the defendant Pernell Guthrie by the name of Charles, and an employee of the defendant Gerald Guthrie by the name of Leo Doyel. The father Pernell Guthrie and the two sons Gerald and Charles each own farms. These farms are located in close proximity to each other. Over a period of years they have periodically helped each other in the various farming operations on each of the farms on a family arrangement basis. No salaries were paid and the work was done on a cooperative basis. The plaintiff is a farm hand and had been working as such for Charles Guthrie for about a year and a half prior to the occurrence in question. He had been a farm hand all his life.

The silo filling was being conducted on the farm of Gerald Guthrie. The machine being used was owned by Charles and Gerald Guthrie. It had been used on prior occasions on the farms of Gerald, Charles and Pernell Guthrie. In addition to this machine Charles Guthrie was furnishing his tractor for use as power to run the machine and Gerald Guthrie furnished the tractor and wagons and cutter being used in the field.

On the Saturday before the accident Charles Guthrie, Gerald Guthrie, a son of Gerald's and the plaintiff had set up the equipment. The silo filling operation commenced on Monday and extended over to Tuesday, the day of the accident. On the day of the accident Gerald Guthrie had employed Leo Doyel to assist in the operation. The defendant Pernell Guthrie had come over to Gerald's farm as on the previous day. Also Charles Guthrie had come over to Gerald's farm bringing with him his hired hand, the plaintiff, also as on the previous day. These men had filled silos before and were familiar with the various tasks that were necessary to complete the operation. Gerald ran the

140

cutter in the field and filled the wagons. Charles hauled the wagons with a tractor from the field to the silo filling equipment. He ran the tractor furnishing the power, helped spot the loaded wagon in front of the silo filling machine and then, while the wagon was being unloaded, he assisted in breaking the ensilage so that it did not clog the machine. Pernell assisted in the spotting of the wagons, helped remove and replace the end gates on the wagons and usually had charge of shifting the clutch to start or stop the auger. Plaintiff and Leo Doyel at times helped spot the wagons and primarily worked in breaking the ensilage as it came from the wagon into the machine.

The silo filling machine is referred to as a blower. It is a metal trough like machine about 10 feet long and 18 inches deep. The sides slope inwardly. The top opening is approximately 2 feet across. In the bottom of the machine there is a 10 inch auger which can be set in motion by means of a clutch lever to draw the ensilage into a blower mechanism. Extending the full length of the blower on one side there is a u-shaped metal covering which is approximately 12 inches wide and 18 inches high above the top of the blower. This covers the belt which is connected to a tractor to furnish power for operating both the auger and blower. A large fan is encased in a circular metal housing located at one corner of the machine which sucks the ensilage away from the auger as it is fed from left to right and blows it through pipes into the silo. This fan housing extends above the top of the trough and above the top of the u-shaped metal belt covering. Directly opposite the fan housing there is a 2 foot platform which forms the covering for the gear mechanism of the auger. The clutch lever protrudes through this platform.

When a load of ensilage is brought to the blower the wagon is backed up to this trough like mechanism so

141

that the back of the wagon is parallel with the length of the trough. The wagon is equipped with a canvas sheet covering the bottom of the wagon. This canvas is in turn connected to a roller at the back of the wagon. The roller is hooked up to a portable gasoline motor which, when placed in operation, winds the canvas on the roller, and as it does so, it pulls the ensilage from the front of the wagon to the back and dumps it into the trough where in turn it is moved by the auger to the fan and blown up into the silo. The ensilage has a tendency to pack in the wagon so that large chunks fall into the trough which are manually broken so that the auger does not clog.

In substance the complaint alleges that plaintiff was an employee of Charles Guthrie and as such was working on the farm of defendant Gerald Guthrie; that defendant Pernell Guthrie was also working on the farm of Gerald Guthrie; that Pernell Guthrie was the servant or agent of Gerald Guthrie; that plaintiff's leg became caught in the auger of the blower as a result of the negligence of Pernell Guthrie; that the negligence of Pernell Guthrie consisted of (1) carelessly placing the wagon in such a position and at such an angle so that plaintiff was unable to maintain his balance while standing on the blower and breaking the chunks of ensilage and (2) carelessly failing to release the clutch so as to stop the auger in time to prevent plaintiff's leg from being caught in the auger; and that plaintiff was exercising due care for his own safety.

To the complaint defendants filed an answer admitting that plaintiff was an employee of Charles Guthrie and as such was working on the farm of Gerald Guthrie; admitting that Pernell was also working on said farm; denying that Pernell Guthrie was the servant or agent of Gerald Guthrie; denying the negligence alleged; and denying due care on the part of plaintiff.

142

The answer also affirmatively alleged (1) that plaintiff assumed the risk of his employment and (2) that he was guilty of contributory negligence. Upon a trial of the issues the jury found for the plaintiff and against both defendants and assessed plaintiff's damages at $12,500. The usual post trial motions were filed and overruled and judgment was entered on the verdict.

On this appeal defendants contend that the trial court should have directed a verdict because (1) that plaintiff failed to prove the acts of negligence as charged; (2) that plaintiff was guilty of contributory negligence as a matter of law; (3) that plaintiff assumed the risk of his employment.

The plaintiff testified that he had been employed by Charles Guthrie for a year and a half prior to the accident as a farm hand. He was paid a monthly wage, given some produce and house rent. On various occasions he was directed by his employer to go to the farms of Gerald and Pernell Guthrie to assist them in various farming operations. He was not paid any additional salary by either Pernell or Gerald on these occasions. Following this custom he had come to the farm of Gerald on the day in question. On prior occasions when he worked on the Gerald Guthrie farm, Gerald directed the work and on this day Gerald decided what should be done. Plaintiff further testified a wagon load of ensilage was brought up from the field and that he, Charles Guthrie and Leo Doyel pushed the wagon up to the blower while Pernell Guthrie spotted the position of the wagon. After the wagon was spotted he said that he noticed that it wasn't square with the trough of the blower; that it was sort of cater-cornered and that he mentioned this to Pernell Guthrie. The tractor was then started and the clutch was thrown, to place the auger in operation. Charles Guthrie stood on the ground at the corner of the wagon

and trough away from the fan mechanism. Leo Doyel was standing on the ground at the back end of the trough midway between the two ends reaching over the tractor belt housing with a pitch fork. Plaintiff stood on the blower machine with his right foot on the tractor belt housing and his left foot on the platform through which the clutch protruded. In this position he was straddle of the auger. He further testified that on prior occasions when he had worked filling silos and on the day before and up until the time of the accident he had stood on the metal platform covering the gear mechanism; that no one had ever told him not to stand there; that he assumed this position for convenience in doing the work and that he could not have reached the ensilage on that side without being up on the blower on this platform. He further said that because of the angle at which the wagon had been spotted he could not stand with both feet on the platform but had to straddle the auger as he did. While reaching for the ensilage in this position, he lost his balance and his right foot dropped into the trough and was mashed by the moving auger. The trough of the blower was full of ensilage when his foot dropped in. He did not know where Pernell Guthrie was when this happened but that "it was quite a little while after my foot got in there before it was shut off."

Pernell Guthrie called as a witness under Sec. 60 testified that part of the time that day he directed the spotting of the wagons and signaled when to stop and turn. He also said that on the day in question all the spotting of wagons was done with the tractor. He admitted operating the clutch mechanism. He admits that on the day in question he stayed near the clutch part of the time and part of the time he didn't. After starting the auger in operation just prior to the accident he went to the front of the wagon to check the canvas sheet and to see if it was moving. When ques-

144

tioned as to whether he was at the front of the wagon when the accident happened he said he had returned to his position at the clutch when plaintiff fell into the machine; that he was back of the plaintiff when he tumbled into the machine and that he grabbed the clutch lever and stopped the auger immediately. Some doubt is cast upon this testimony by reason of his answer to questions propounded on taking of a pretrial deposition. Pernell Guthrie also testified that he was not employed by either Charles or Gerald but was assisting in accordance with the work arrangement existing between him and his two sons.

Charles Guthrie testified that he did not see the plaintiff slip. His attention was first directed to something unusual when he heard the plaintiff holler. He then ran back to shut off the tractor. The auger was shut off before the tractor was stopped but he was unable to say what time transpired between the plaintiff shouting and the auger was stopping. As to the position of the wagon in reference to the blower, he says it was about average; that the ensilage was falling into the blower the way they wanted it to.

Leo Doyel saw the plaintiff slip into the trough. He had no recollection of where Pernell Guthrie was when this happened. He did not remember the wagon being at an angle but thought it was in fairly good position.

Charles Guthrie also testified that on the day before the accident when the silo filling was commenced he had said to another employee "I wish you fellows would stay off the blower." In this he was corroborated by this employee who also said that the plaintiff was close enough to hear the statement. Plaintiff denies the statement and further says that on all prior occasions he stood on the end of the blower.

One further thing deserves mention. An examination of the photos in evidence reveals that because of the presence of the so called platform and fan housing

145

at the one end of the blower machine, a person working at that end would have some difficulty, while standing on the ground, in reaching the ensilage as it fell into the trough. To this extent the photos corroborate the plaintiff when he says he had to be up on the blower to effectively accomplish his job.

■ ■ It is first contended by defendants that the plaintiff and the defendant Pernell Guthrie were fellow servants of Gerald Guthrie and that the fellow servant doctrine applies. To arrive at this conclusion defendants rationalize that Pernell Guthrie was an employee or servant of Gerald Guthrie and that while plaintiff was employed as a hired hand by Charles Guthrie, he was, with his consent, loaned by Charles Guthrie to Gerald Guthrie for the service of filling the silo and thereby became the employee of Gerald Guthrie for the performance of this work. Unless therefore the first premise can be sustained, there can be no need of considering the second.

A careful examination of the record in this case discloses that none of the usual incidents of an employer-employee relationship are present in this case as between Pernell Guthrie and Gerald Guthrie. On the other hand we have here a situation where three individuals are joining together from time to time for the doing of something for their mutual benefit. Each person owned a farm. The blower in question was owned and maintained by two of them and was used to do the work of each upon the farms occupied by each, and to be made use of by the combined labor of all. As occasion required in the ordinary prosecution of their farm work, the work, though performed for the benefit of each as an individual, was treated by them as a joint undertaking to be participated in by all. The transaction then, as an entirety, as between the father and the two sons, bears many of the earmarks of a joint enterprise i. e. a part of a common enter-

146

prise for their mutual benefit. We are of the opinion, that under the undisputed facts in this case, Pernell, Charles and Gerald should come within the rules of law generally applicable to joint enterprises. As to this field, the law is well settled. In 48 C. J. S. Joint Adventures, Section 14, page 870, it is said:

"With respect to a joint adventure involving the control and operation of premises or places, or the use of mechanical contrivances, all joint adventurers are liable for personal injuries suffered by others from negligence in the maintenance, installation, or operation of such premises, places, or contrivances, including instances in which the actual negligence is that of some, but not all, members of the joint adventure, . . ."

The theory of the rule, is that one joint adventurer is the agent of all in the promotion of the joint adventure. It therefore becomes unnecessary to determine whether the plaintiff was an employee of Charles Guthrie or an employee of Gerald Guthrie under the loan of an employee doctrine.

■ ■ Defendants next contend that plaintiff was guilty of contributory negligence as a matter of law. In support of this contention defendants invoke the rule that where there are two or more ways or methods by which a servant may perform his duties, and he voluntarily chooses the most hazardous, knowing it to be such, he does so at his own risk citing in support thereof Crowe v. Northwestern Malt & Grain Co., 171 Ill. App. 285, and Kath v. East St. Louis and Suburban Ry. Co., 232 Ill. 126, 83 N. E. 533. While we do not dispute the general rule, it is important to recognize that in order to render the rule operative against the servant, it must appear that a safe or reasonably safe method of doing the work was available to the servant, that he knew, or in the exercise of reasonable care should have known, of the existence of such method,

147

that the selection of the unsafe method was voluntary on his part, that he knew or was chargeable with knowledge of the danger inhering in the method chosen, and that the danger was so imminent and threatening that a man of ordinary prudence would not have taken the chances of encountering it. 56 C. J. S. Master and Servant, Section 450 page 1277. Defendants seek to apply these rules by contending that plaintiff could have assumed a safe position on the ground at the edge of the wagon. This contention assumes a material fact that is in dispute, namely that in such a position plaintiff could have properly performed the work entrusted to him. From the evidence as we have heretofore detailed it, this fact was a controverted one and being such necessarily made the question of contributory negligence a question of fact for the jury. We therefore conclude that this case falls short of establishing as a matter of law, at least one of the essential elements necessary to bring the general rule into operation.

We next consider the question of assumption of risk which the defendant contends was a question of law for the trial court necessitating the direction of a verdict. The doctrine of "assumption of risk" is firmly established as a part of the law of master and servant. In general, it is the doctrine whereby an employee assumes the risks, hazards, or dangers ordinarily incident to the discharge of his duties in the particular employment. However the law does not recognize the master's negligence as being an ordinary and usual risk incident to the employment. More specifically the master must use reasonable care and caution to secure the safety of his servants while engaged in and about his business. This degree of safety secured to the servant cannot be the same in all lines of employment. After the master has exercised the rea-

148

sonable care required of him by the law, the servant assumes the risks peculiar to his particular work. If the employment is in its nature dangerous, it is not to be expected that all those dangers will be eliminated by the exercise of the reasonable care required of the master by the law, and there will remain a certain amount of risk varying in degree according to the dangerousness of the employment, to be assumed by the servant after the master has exercised the degree of care which the law says shall be the reasonable precaution demanded of masters in the particular line of business and gauged by the circumstances of the case. The rule that the servant assumes the ordinary risks incident to the business pre-supposes that the master has performed his duties. Hansell-Elcock Foundry Co. v. Clark, 214 Ill. 399, 73 N. E. 787; Kenny v. Marquette Cement Manufacturing Co., 243 Ill. 396, 90 N. E. 724. Thus the master in the performance of his duties is, among other things, required to provide reasonably safe machinery and appliances, a reasonably safe place to work, to provide for inspection and repair of premises and appliances, to inform and warn unskilled servants of the danger of a situation and where as in this case he undertakes the operation of dangerous machinery at which the servant is working, to use diligence and care in its operation. 35 Am. Jur., Master and Servant, Section 138. And the servant has the right to assume that the master will perform the duties imposed upon him. McCulloch v. Illinois Steel Co., 243 Ill. 464, 90 N. E. 664.

The foregoing principles are in some measure qualified in instances where the servant has knowledge or is chargeable with knowledge that the place provided for work is unsafe and he continues to work without complaint or where he has knowledge or is chargeable with knowledge of a defective condition of the ma-

149

chinery or appliances and continues to use the machinery or where the danger incident to the machinery is open and obvious, provided, he also appreciates the danger attendant upon his continuing to work under these circumstances. Richter v. Tegtmeyer, 167 Ill. App. 478; Wheeler v. Chicago & W. I. R. Co., 267 Ill. 306, 108 N. E. 330 affirming 182 Ill. App. 194. The question of assumed risk is usually and normally one for the jury and involves the subsidiary question of whether the servant understood and appreciated the risks which he is alleged to have assumed. Preble v. Wabash R. Co., 243 Ill. 340, 90 N. E. 716; Fox v. Beall, 314 Ill. App. 144, 41 N.E.2d 126; Linderman Box & Veneer Co. v. Thompson, 127 Ill. App. 134.

Defendants rely upon the cases of Barrett Manufacturing Co. v. Marsh, 137 Ill. App. 110; Stahl v. Dow, 332 Ill. App. 233, 74 N.E.2d 907; Collins v. Kurth, 247 Ill. App. 156; Levi v. Illinois Box Co., 161 Ill. App. 157; Frink v. Potts, 105 Ill. App. 92, as authority for the contention that assumption of risk became a matter of law and therefore the trial court should have directed a verdict. An examination of these cases reveals recovery was sought on the theory of negligence in failing to warn an inexperienced servant of the dangers arising from the particular revolving machinery. None of these cases involve negligence in failing to provide a reasonably safe place to work or negligence in the actual operation by the master of the machinery. In the above cases it conclusively appeared that the danger of the machine was open, obvious and apparent so that no warning was necessary and that the servant was either experienced in its use or had been instructed by the master in its use. These cases in our opinion have no application to the case at bar. We are therefore of the opinion that the question of assumption of risk was a question of fact for the jury

and that the trial court did not err in refusing to direct a verdict.

In the case at bar there necessarily was a conflict in some of the material facts. However, there is evidence in the record from which the jury could justifiably conclude that defendants were negligent, that plaintiff was not guilty of contributory negligence and that plaintiff did not assume the risk of his injury.

 Where evidence is conflicting, it is for the jury to weigh the evidence and determine the credibility of the witnesses, and a verdict based upon conflicting evidence approved by the trial judge should not be disturbed on appeal unless contrary to the manifest weight of the evidence. Spiker v. Christeson, d/b/a Ham & Merv Taxi Co., 12 Ill.App.2d 557, 140 N.E.2d 302. To be contrary to the manifest weight of the evidence an opposite conclusion must be clearly evident. DeLong v. Whitehead, 11 Ill.App.2d 330, 137 N.E.2d 276; Green v. Keenan, 10 Ill.App.2d 53, 134 N.E.2d 115; Griggas v. Clauson, 6 Ill.App.2d 412, 128 N.E.2d 363. Such is not the situation in the case at bar.

Accordingly the judgment of the Circuit Court of Greene county will be affirmed.

Affirmed.

CARROLL, P. J. and REYNOLDS, J., concur.