John Donegan, Plaintiff in Error, v. Walter C. Hately and John A. Bunnell, Defendants in Error.

## Gen. No. 14,707.

1. MASTER AND SERVANT—*when question of assumed risk one of fact.* Unless the court can say as a matter of law that the servant knew and appreciated the peril to which he was exposed, the question is one to be determined by the jury.

2. NEGLIGENCE—*when question for jury.* When the evidence, with all the reasonable inferences which may legitimately be drawn therefrom, tends to support the charge of negligence in the declaration, the question is one of fact which should be submitted to the jury.

Action in case for death caused by alleged wrongful act. Error to the Superior Court of Cook county; the Hon. ROBERT W. WRIGHT, Judge, presiding. Heard in the Branch Appellate Court at the

Donegan v. Hately et al., 152 Ill. App. 96.

October term, 1908.  Reversed and remanded.  Opinion filed December 7, 1909.  Rehearing denied December 21, 1909.

JOHNSON & MOLTHROP, for plaintiff in error.

LACKNER, BUTZ & MILLER, for defendants in error.

MR. JUSTICE SMITH delivered the opinion of the court.

The question presented by this record is whether or not the trial court erred in directing a verdict for the defendants at the close of the plaintiff's evidence.

No question is made on the pleadings.  From the evidence for the plaintiff it appears that on May 15, 1905, David Donegan, plaintiff's intestate, was in the employ of the defendants, who were engaged in a packing business conducted in a large building at the Stock Yards in Chicago.  The east wall of the building ran north and south.  East of the wall and adjoining it planking was laid on the ground the entire length of the building.  Further to the east, and running parallel to the building, was a railroad platform, elevated about four feet above the planking, and about the level of the floor of box cars standing on the switch track which ran parallel with and just east of the platform.  It was eight or nine feet wide.  There was a door in the east wall of the building from which a runway ran up to the railroad platform.  The runway was constructed of planks and was about twenty feet in length.  It was made in two sections.  The upper section was a little over seven feet in length, and four feet two or three inches in width, and was supported at its lower or western end by a wooden horse.  The lower section was only three feet and six inches in width and had to be taken down every night to permit the closing of the door of the building.

On the upper surface of the runway were nailed two 2x4 pieces, extending the entire length of the runway.  On the lower section the north 2x4 piece ran parallel with the north edge of the runway at a distance of

about eight inches from the north edge. The south scantling ran parallel with the south edge of the runway and about eleven inches from it.

On the morning in question a box car load of bulk salt stood on the switch track with its center side door about fifteen feet south of the point where the runway connected with the railroad platform. The deceased and four other men were put to work unloading the car of salt. They commenced the work about 7:30 in the morning of the day of the accident. The deceased and two others were wheeling the salt in carts from the car down the runway into the building, while plaintiff's witness Flynn and another loaded the salt into the carts in the box car. The carts used had boxes between three and three and one-half feet long and a little over three feet wide. An axle was secured to the bottom of the box. The wheels were of a design similar to buggy wheels, and about three and one-half feet in diameter. Each cart was provided with two handles which extended under the box and at one end of the box extended out about two feet beyond the box, near the bottom corners of the box. At these corners there were two legs, one at each corner, to provide a rest for the cart. The space between the handles was about two feet. The track of the wheels was about three feet. The carts were handled or drawn behind the person operating them. His position was between the handles with his back to the cart. When the work of unloading the salt first commenced the men took the carts along the railroad platform to the south of the car and down a permanent incline and into what was called a salt shed. They continued this route for about two hours. The foreman, Martin, who had charge of the men and hired and discharged them, then ordered them to take it down the runway above described and take it to the elevator. In obedience to this order the men commenced taking the salt down the runway. The witness Flynn's description of the way the men took the carts down this runway is as follows:

"I saw Donegan every time he went down. He would pull right up to the runway on the platform, get the truck even and get his feet in between the two by four and get one of the wheels on each side of the two by four and hold back with the load as strong as he could, because it was a steep runway going down. He had his back up against the truck and bearing down on the handles. He would put the legs down and let it slide on the runway and hold his back against the box of the cart. He would be braced with his feet going down the best way he could to hold back on the truck with a heavy load. As soon as he left the top of the runway the truck started to go faster. The trucks would be going faster at the bottom. Nobody was helping down the runway."

Flynn thus describes the manner in which Donegan received his injury:

"Nobody helped Donegan go down this runway. He got hurt on either the third or fourth trip down. I saw him make the trip down. I would say he had between six and seven hundred pounds of salt on the wagon. I would say the truck weighed three hundred pounds. On his fourth trip down he pulled from the platform onto the runway. He got on the top all right and went along until he came a little ways on the second part of the runway. The second part of this runway was a little narrower and he was a new man and he tried to hold back on the truck as usual and the truck seemed to get the best of him and he held the truck against the two by four. It tipped over and the truck of salt and all went down with him. I went down and picked him up. The place where this truck fell off was about two and one-half feet high.

"At that time he held back on the truck going down. The truck went down straight, only the runway was narrower below this first part of the runway and when the wheel rubbed against the two by four, the truck was too wide and it got right off the runway. The

track of the wheels on that truck was a little over three feet.''

The testimony of Dr. Macleary, who treated Donegan in his last illness from May 16, 1905, until his death, is that he was suffering from a perforation of the bowels; that he was operated upon, and about three inches of his intestines were taken out and the ends brought together. Donegan recovered so far as the operation was concerned, but he died from septic inflammation and multiplied abscesses due to poisonous matter that had escaped through the rupture of the bowel into the abdominal cavity.

Donegan left him surviving his father sixty-two years of age, his mother sixty years of age and six brothers and sisters. He contributed to the support of his father and mother and two young brothers and a sister, contributing about $5 a month.

The evidence tended to show that although Donegan had been working for defendants five or six weeks, the car of salt which they were unloading was the first one he worked on, and it was the first time he attempted to use the runway in question with the kind of truck they were using.

The negligence averred in the declaration was a failure to provide a reasonably safe place in which to work; in failing to furnish sufficient help; and in failing to properly guard and protect the runway, each count averring the deceased was ignorant of the danger.

On the question of the negligence of the defendants the evidence shows that the runway in question which Donegan was directed to use was so constructed that at the point where the lower section commenced it narrowed down suddenly to a width a very little greater than the tread of the wheels of the trucks. It appears that the loads which Donegan and his fellow workmen were required to take down this narrow runway were very heavy, so heavy, indeed, that a jury might reasonably infer that with reasonable care it

was impossible to so handle the loaded truck as to keep it safely on the runway. The evidence warrants the inference that the men were not only required to exert their utmost strength against the loaded truck, but that even then the speed of the trucks increased as they descended to and upon the narrow part of the runway, and that the men were thereby placed in great peril when required to handle loads of the weight shown upon a narrow runway. The position which the men necessarily took between the handles in order to manage the load subjected them to the peril of being thrown off the runway in case one of the cart wheels ran off the side of the runway. We think the evidence, with all reasonable inferences from it which may be drawn legitimately, tended to support the charges of negligence in the declaration, and hence, the negligence of the defendants was properly a question of fact for the jury. The court could not say as a matter of law that there was no evidence of negligence. Supple v. Agnew, 191 Ill. 439; Swift & Co. v. Rutkowski, 182 *id.* 18; Armour v. Golkowska, 202 *id.* 144.

We also think that on the evidence in the record the questions of assumption of risk and contributory negligence were questions of fact for the jury under proper instructions. The court could not say as a matter of law that, because Donegan had taken two or three loads down the runway just prior to his injury, and because it was obvious that the runway was narrow and its edges were unprotected, he was aware of and appreciated the peril to which he was exposed, and therefore assumed the hazard as a risk of his employment. The reasoning of the courts in Armour v. Golkowska, *supra,* and in Jones & Adams Co. v. George, 125 Ill. App. 503, is applicable to the evidence in this case. Nor, on the other hand, could the court say, as a matter of law, that in obeying the order of the foreman, as Donegan did, the danger was so imminent that a man of ordinary prudence would not have incurred the risk.

In our opinion the court erred in instructing a verdict, and the judgment is therefore reversed and the cause remanded for a new trial.

*Reversed and remanded.*