## Robert S. Shook, Administrator, Plaintiff in Error, v. Majestic Coal & Coke Company, Defendant in Error.

MASTER AND SERVANT—*when doctrine of assumed risk applies.*
If an experienced servant, of mature years, knowing the conditions under which the work in which he was engaged was performed, continues in the service of his master, he is deemed to have as-sumed the risk incident to such service. *Held*, in this case, that the colliding of cars which caused the injury was not an extra-ordinary risk but was one which had been assumed.

SHIRLEY, J., dissenting.

Action in case for death caused by alleged wrongful act. Er-ror to the Circuit Court of Perry county; the Hon. W. E. HADLEY, Judge, presiding. Heard in this court at the March term, 1911. Affirmed. Opinion filed November 11, 1911. *Certiorari* denied by Supreme Court (making opinion final).

H. E. KIMMEL and WILLIAM A. SCHWARTZ, for plaint-iff in error.

DAN McGLYNN, for defendant in error.

MR. JUSTICE McBRIDE delivered the opinion of the court.

This suit was commenced by the plaintiff in error against the defendant in error in the Circuit Court of Perry county, Illinois, and disposed of at the Novem-ber term, 1910, of said court. A trial was had be-fore a jury, evidence heard on behalf of plaintiff and at the close of plaintiff's testimony the court directed the jury to find the defendant not guilty, and a verdict was rendered accordingly. Motion for a new trial made by plaintiff and overruled and the cause is brought to this court upon a writ of error.

It appears from the record in this case that on Jan-uary 22, 1909, and prior thereto, the defendant in error was engaged in the business of mining and shipping coal at Perry county, Illinois; that there were three tracks at this mine, the east track being

used for loading the cars with lump coal, the west track for the loading of cars with screenings and the middle track with the loading of egg coal; that the egg track extended north and from the point of intersection of the other two tracks north, was known as the middle track; that the lump track and screening track connected with the said egg track at the distance of about 60 yards from the plant. The cars were loaded by running them under a tipple, located over these tracks; there was also a shaker screen operated by an engine located west of the screening track. The egg track, north of the point where the other two tracks connected with it, was used as a place for storing empty cars, and as the cars were needed from time to time they were brought down upon such of the tracks, as they were required to be used. There was always a passageway left between the cars under the tipple and the empty one next to it so that Adams could go through this passageway from his work on the lump track to his work on the egg track and shaker engine. Jackson Adams' work was on the egg and lump coal tracks, and caring for the engine, and as the cars would come down upon these tracks he would scotch them and hold them until they were ready to be used; he would then remove the scotch and let them down to the tipple to be loaded. In going from the lump track to the shaker engine he would pass the egg and screening tracks. On January 22, about three o'clock, the mine temporarily stopped hoisting but the shaker engine was still running, and Adams and the other men at work passed over to a point between the egg track and lump track and were there standing by a fire. At the time of the injury there was on the egg track a car under the chute being loaded and two empty cars just north of it. The egg track would hold three fifty-ton cars but not in the clear, unless one move had been made of the car under the chute being loaded. There were three fifty-ton cars stand-

ing on the egg track at the time of the injury; they
didn't clear the way for the car coming in from the
north.   It was the business of a workman by the name
of Martin to bring the cars down from the empty track
on to the other tracks as they were needed from time
to time.   Martin was called the car rider and gen-
erally stopped the cars when he brought them down
but when there were no cars on the track sometimes
Adams helped him.   Adams and Kirkpatrick looked
after the cars on the egg and lump track.   One move
under the tipple is about four or five feet.   When
standing by the fire Brown directed Purdy, Mann, and
Kirkpatrick to load a car out of No. 4 bin; they left
the fire and Adams remained there.   About this time
Brown the foreman directed Martin, the car rider, "go
up and get two cars and put them on the screening
track right away."   Martin went up to run the cars
from the empty track on to the screening track.   At
the time that Brown gave this order he was standing
about twelve feet from the north end of the cars on
the egg track, facing Martin, with nothing between
Brown and the cars.   Martin usually determined
whether the cars coming down on the screening track
would clear the car standing on the egg track by ex-
tending his arm; he did not do that on this occasion
but, as he says, supposed the cars would clear and
started two cars down on the screening track and as
they moved south they struck the empty cars that
were standing on the egg track.   About this time
Adams was passing from the fire across the egg track
towards the engine room with a pair of slickers or
rain pants in his hands ostensibly for the purpose of
hanging them up in the engine room; as he passed
over the egg track the car that had been bumped by
the cars passing on the screening track caught him
between the coupling of that car and the one that
was being loaded and killed him.

The witness Martin says:

"I had not been about the fire where Mr. Adams

was; I had been getting cars down; I had just brought one car on the egg track; one was already standing there; there were three cars in all on the egg track; I brought the one under tipple; do not know whether it had been moved under the tipple or not; one move on a car under the tipple is about four or five feet; it had been probably an hour before the injury that I brought the car in that was under the tipple on the egg track; I had brought others in on the other tracks after I brought it in; I brought the one north of the one being loaded under the tipple in, then brought some on the lump track and then brought the second car on the egg track; that is the last one on the egg track; I was then standing on the end of the car by the brake; men had been passing between the cars, going back and forth across the track, ever since I had worked there; that was the custom; no one looks out for them that I know of when they go between these cars; as far as I know, there was no one there to look out for them as long as I worked there; when Brown told me to get the two cars for the screening track I was still on the car I had just brought down; I had stopped the car with the brake; I had let this car ease against the car ahead; I do not know how long he staid there after giving me the order; he was there when I left; I had to go about one hundred yards; the empty cars were about 112 to 125 yards north of the scale; it was about 115 yards from where I left the car to where the empty cars were; I brought down a forty and a fifty ton car; I thought the fifty ton car was farthest south but I don't remember; I rode the fifty ton car; I controlled them by a brake; no one else had control of the cars; no one controlled these cars when I brought them down, as I did these, except myself; I had a right to stop them when I thought it necessary; I did not see whether the cars would clear or not when I was bringing them down; do not know whether first car was a forty ton and passed the clearing place or not; in determining whether the car was in the clear I stood upright with my right foot on the rail, standing sideways, and extending my right arm (indicating), and if your hand touched the car it wouldn't clear; I did not determine

it on this occasion; Mr. Brown was not there when the cars came down that I saw; I do not know how long he remained there after giving me order; cars did not lack much of clearing, about two inches I think; cars caught on the corners of frames; car on egg track was wooden bed and the others were steel bed.''

Adams had nothing to do with the cars brought down on the screening track; Adams had been engaged at work in this mine in caring for the engine and moving the cars under the chute for about two years and Martin says that he had worked as car rider about three months before Adams was injured, and during that time other cars collided as those did at the time Adams was injured; that occurred some two or three times a day and sometimes it didn't occur at all. The witnesses all agreed that the business at this time was being conducted in the usual and customary way of conducting the business at that mine, and that the men in passing to and fro through this passageway looked out for themselves, and there is but little variance in the testimony of the several witnesses.

There were two counts in the declaration upon which a trial was had, and were called the first count and the fifth count. The first count charges substantially, that the defendant negligently and carelessly ran an empty car down the empty track to and on the screening track so as to cause the same to come into collision with an empty car standing on the middle or egg track, thereby putting it in motion and causing it to move down and against the car under the chute with great force and violence and caught the said Jackson Adams between the said cars while he was passing between them in the exercise of due care.

The fifth count charges that the defendant by and through one Allen Brown, its foreman, ordered Adam Martin to go up the incline and turn loose some empty cars without first ascertaining whether the cars that

were on the egg switch had so cleared the junction of the third switch that the cars coming down on the screening track would not strike the cars standing on the egg track, whereby the said Jackson Adams was caught between the two cars as they came together and as a result of such collision was killed.

At the conclusion of plaintiff's evidence a motion was made by the defendant to exclude the evidence and direct a verdict for the defendant, which motion was allowed, the evidence excluded and the jury directed to find the defendant not guilty, which it did and the verdict was accordingly returned.

It is claimed by counsel for plaintiff in error that the court, under the testimony, erred in directing a verdict for the defendant. It is contended by the defendant in error that the court was justified in directing a verdict, first, because under the evidence the deceased assumed the risk; and, second, that the act of negligence, if any, was that of a fellow servant, and for that reason the defendant was not liable for the injury to the deceased.

In discussing the question as to whether or not this was an assumed risk, it is well to review some of the authorities upon this question in order that we may arrive at the true principle, and correctly apply it to the facts in this case. Jackson Adams was a man of mature years; had been engaged at this same work for about two years and knew the manner of handling the cars, bringing them down upon the several tracks and loading them at the mine; at least whether he actually knew these things or not, he is presumed in law to have known them, and is presumed to have known that it was a frequent occurrence that in bringing cars from the empty track on to the screening track that they collided with cars standing upon the egg track; and we think, that as he knew the conditions under which the work was performed and continued in the service of the defendant, that he assumed the risk incident to the services and that the colliding

of the cars was not an extraordinary risk or a special occurrence, but having happened two or three times a day, frequently, as the witnesses testified, it certainly became one of the risks incident to the manner of conducting the business at this mine, and whether or not the mode adopted was the safer one could not be invoked by the deceased or his legal representatives to avoid the doctrine of the assumption of risk. "It is the settled law that the servant, when he engages in the employment does so in view of the risk incident to it; that he will be presumed to have contracted with reference to such risks and assume the same, and that if he receives an injury resulting from the incidental risks and hazards ordinarily connected with the employment he cannot hold the master responsible." Cooley on Torts, 521; 20 Am. Enc. of Law (2nd Ed.), 109.

The rule also applies in any case where the servant during the course of his employment becomes aware of a defect but voluntarily continues in the employment without objection. Following the universal rule, this court has stated this principle in numerous cases, among which are the following: It is said in Simmons v. Chicago & Tomah R. R. Co., 110 Ill. 340: "If a servant knowing the hazards of his employment as the business is conducted, is injured while engaged therein, he cannot maintain an action against the master for the injury merely on the ground that there was a safer mode in which the business might have been conducted, the adoption of which would have prevented the injury." In the case of Chicago & Eastern Ill. R. R. Co. v. Geary, 110 Ill. 383, the court said: "The rule is as contended by counsel for appellant, namely, when an employe after having the opportunity to become acquainted with the risks of his situation, accepts the same, he cannot complain if he is subsequently injured by such exposure. One may, if he chooses, contract to take the risks of a

known danger. Presumptively, he charges in such case in proportion to the risk or rather for the risk.'' In the case of Herdman-Harrison Milling Co. v. Spehr, 145 Ill. 329, it is said: ''As between employer and employe the latter assumes all the usual known dangers incident to the employment or service; and that he also takes upon himself the hazards of the use of defective tools and machinery, if after his employment, he knows of the defect but voluntarily continues in the employment without objection.'' These are familiar rules of law often recognized by the decisions of this and other courts.

In East St. Louis Ice & Cold Storage Co. v. Crow, 155 Ill. 74: ''If the injury was the result of obvious defects in the barge where he was working, or from causes known to him, or which he might have known in the exercise of due care, he cannot recover.'' * * * ''It is also the general rule that an employe of sufficient age and experience is chargeable with knowledge of the ordinary conditions under which the business is conducted and its ordinary risks and hazards, and will be presumed to have notice of and to have assumed all such risks and hazards which to a person of his experience and understanding are, or ought to be, patent and obvious.'' C. & E. I. R. R. Co. v. Heerey, 203 Ill. 492-6-7.

Counsel for plaintiff in error seek to avoid this principle by invoking the doctrine that it is the duty of the master to furnish the servant with a reasonably safe place to work, and that the servant does not assume the risk of the negligent acts of the master, and many of the authorities to which we have been referred by him are claimed to be in support of these propositions. It is probably true, as an abstract proposition of law, that it is the duty of the master to furnish the servant with a reasonably safe place, and that a servant does not assume the risks of the negligent acts of the master, but these principles are limited by the authorities by the further doctrine that

if the servant knows that the place furnished is not reasonably safe, or knows of the negligent acts of the master, then the doctrine is not applicable, and the servant would not be relieved simply because of the master's failure in such respects. The Supreme Court, in the case of C. & E. I. R. R. Co. v. Heerey, *supra,* says, on page 501: "The first part of the instruction was correct. As a matter of law the employe does not assume risks arising from the negligence of the master unless he is chargeable with knowledge of the fact of such negligence and of the defect or risk." In the case of Kath v. E. St. L. Suburban Ry. Co., 232 Ill. 126, it is said: "The court gave to the jury the following instruction upon the question of assumed risk, 'The court instructs the jury that the servant only assumes the ordinary risks of the business, that is the risks which are so open and obvious that they may be discovered by the servant by the use of ordinary care, and the servant also assumes such risks as are known to him; but the servant does not assume extraordinary risks which are unknown to him and which could not be discovered by the exercise of ordinary care, and he does not assume risks due to the master's own negligence.' This instruction was clearly wrong in that it informed the jury that the deceased did not assume risks due to the master's own negligence, as the authorities uniformly hold that an employe assumes all risks connected with the business in which he is employed, and of which he has notice, even though they are produced by the negligence of the master, if he continues in the employment." Again, in the same case on page 132, the court says: "The deceased had passed over said track while operating his car, at the point where he was injured, daily from April to December, 1904, and in the very nature of things must have known the situation of said pole and the condition of said track at that point, and knowing said conditions he assumed the risk of being injured therefrom. In Camp Point

Mnf. Co. v. Ballou, 71 Ill. 417, the doctrine was announced, which has been frequently reiterated by this court, that an employe cannot recover for an injury suffered in the course of the business in which he is engaged, from the defective condition of the machinery or appliances used therein, after he has knowledge of such defective condition, unless he continues his employment under a promise to repair, and it has repeatedly been held that an experienced adult employe is chargeable with knowledge of the ordinary conditions under which the business in which he is employed is conducted and assumes its ordinary risks and hazards, and will be presumed to have notice of and to have assumed all such risks and hazards which to a person of his experience and knowledge are or ought to be patent and obvious, (Chicago & Eastern Illinois Railroad Co. v. Heerey, 203 Ill. 492) and that an employe assumes all hazards which are obvious and apparent and which are known to him, although such conditions are produced as the result of the master's negligence, if he continues in his employment without a promise to remedy such defects." Browne v. Siegel, Cooper & Co., 191 Ill. 226; Elgin, Joliet & Eastern Ry. Co. v. Myers, 226 id. 358."

Again, in the case of E. J. & E. Ry. v. Myers, 226 Ill. 358, the same doctrine announced in the case of C. & E. I. Ry. Co. v. Heerey, is quoted and approved.

We are of the opinion that the limitations upon the duties of a master as above set forth are fully sustained by the authorities herein above cited, and many more to which reference could be made.

Counsel for plaintiff in error have referred us to several cases showing where the servant has been injured and recovered because of the failure of the master to furnish him a reasonably safe place to work, but an examination of these cases will disclose that while the place was unsafe, the servant had no knowledge of its unsafety and was for that reason allowed

to recover. In the case of Libby, McNeill & Libby v. Scherman, 146 Ill. 540, it was expressly held that the injury was caused by an extraordinary risk and the evidence tended to show that the head of the defective barrel had been knocked in and contents removed a few minutes before the workmen quit the work on the evening before, and that on next morning the accident happened, and that the plaintiff was injured, but the case recognizes all the way through that the servant assumed the ordinary perils. In the case of Donegan v. Hately et al., 152 Ill. App. 96, the plaintiff in that case had taken only two or three loads down the runway prior to his injury, and the court properly held that he could not say as a matter of law, under such circumstances, that it was an assumption of risk. In the case of Missouri Malleable Iron Co. v. Dillon, 206 Ill., the accident was caused by a hole in the floor, and the court says there on page 152: ''The evidence is clear and conclusive that the appellee had no knowledge of this hole in the floor while he was so at work, or prior to his entering upon the work.'' In the case of Kennedy v. Swift, 234 Ill. 606, ''the hook used by the servant was defective and the servant was not familiar with the condition of the hook, and had no time after being sent upon the plank to examine the hook or plank and for that reason it was held that it was not an assumption of risk.''

We think an examination of all the cases will disclose that this distinction has been borne out by the courts.

Again, it is claimed by counsel that this was an act of the master, and that it was a negligent act and performed under a specific order of the master; but we do not agree with this contention. The servant Martin was regularly in the performance of driving the cars from the empty track down on to the other tracks, as they were needed, and bringing from time to time such cars as directed, and we regard the order here spoken of as simply a general direction to do

work within Martin's regular line of employment. There is no specific direction to Martin to work in a particular place or in a particular manner; he was left free to exercise his own discretion as to the manner in which he should do the work, and there was no peremptory direction about it, and for that reason does not fall within the rule invoked, even if the rule were applicable to this case. See cases of C. & A. Ry. Co. v. Landroth, 123 Ill. App. 656; Linderman Box & Veneer Co. v. Thompson, 127 Ill. App. 134.

We do not think that the direction given as shown by the evidence in this record in any manner relieves the deceased from the risk assumed by him in the performance of this work. We are also inclined to the opinion that the deceased and Martin were in law fellow-servants, but in the view that we take of this case, from what has already been said, it is not necessary to discuss the question of fellow-servant.

We are of the opinion that as the deceased, as a matter of fact and law, had knowledge of the conditions as they existed at that mine, and in the handling of that coal and the operation of the cars upon the different tracks, he assumed the risk of the work, and that the court was warranted in directing the jury to return a verdict for the defendant and in overruling plaintiff in error's motion for a new trial, and the judgment of the Circuit Court is affirmed.

*Judgment affirmed.*

MR. JUSTICE SHIRLEY, dissenting.