## John Moylan, Appellee, v. Chicago River & Indiana Railroad Company, Appellant.

### Gen. No. 17,055.

1. RAILROADS—*must use ordinary care to maintain switches in safe condition.* A company owning tracks owes a duty to employes of other companies using the tracks by agreement to exercise ordinary care to maintain its switches and switch stands in a reasonably safe condition.

2. RAILROADS—*when theory of no duty to use special device is inapplicable.* When a brakeman on a train being operated by agreement on the tracks of another company is injured by the engine splitting an open switch, the theory that a railroad company cannot be required to adopt any particular method or any special device to make appliances safe is inapplicable when the switch lock had been broken several weeks prior to the accident.

3. RAILROADS—*when company owning tracks is liable to employe of another road.* Where the tracks of a company are used by agreement by many companies, if the negligence of employes of a company using the tracks in not locking a switch is the proximate cause of a brakeman of another company being injured by an engine splitting the switch, the company owning the tracks is liable.

646 APPELLATE COURTS OF ILLINOIS.

Moylan v. Chicago River & Indiana R. Co., 172 Ill. App. 645.

4. RAILROADS—*when testimony as to open switch is not incredible.* A brakeman, engineer, and fireman on an engine being operated by agreement on the tracks of another company testified that a switch appeared to be closed and that the front wheels passed the switch, but the rear wheels split the switch, derailing the engine and injuring the brakeman. The company owning the tracks contended that it was absurd and incredible that an accident could have happened in such a manner; an experienced railroad man testified that a switch could not be split without buckling the rods, which were not buckled, but another witness testified that there was a space or "play" between the points of the switch and the main track. A latch controlling the switch lever was not broken, though it would have been if the switch had been completely close. The lock to the switch lever was broken prior to the accident. *Held,* a verdict for the plaintiff was not against the weight of the evidence.

5. RAILROADS—*when negligence in not providing switch lock is for the jury.* Where an engine being operated by agreement on the tracks of another company is derailed by splitting an open switch, and there is evidence that it appeared to be closed and that the lock to the switch lever was broken, negligence of the company in having the switch open and in failing to provide a lock is for the jury, even though there is evidence that it is incredible that the accident could have happened in such a manner.

6. RAILROADS—*when negligence of company as proximate cause is for jury.* A brakeman on the front of an engine being operated by agreement on the tracks of another company testified that a switch appeared to be closed, that the engine split the switch and he was injured. There was evidence that the switch was partially unfastened and that the lock had been broken. It was contended the brakeman ought to have seen the condition of the switch. *Held,* it was a question for the jury whether the negligence of the company or the failure of the brakeman to notice the condition of the switch was the proximate cause of the accident.

7. APPEALS AND ERROR—*when error in admission of evidence is cured by instruction.* Where there is evidence that a railroad accident occurred by reason of an open switch and that the switch lock was broken, error in admitting evidence of a custom upon defendants' railroad, and upon other railroads to provide and use a lock is cured by an instruction stating that the custom should not be taken into consideration and that the question is, was the particular switch stand a reasonably safe appliance.

Appeal from the Superior Court of Cook county; the Hon. BEN M. SMITH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed. Opinion filed October 3, 1912.

Rehearing denied and opinion modified and refiled October 17, 1912. *Certiorari* denied by Supreme Court (making opinion final).

WINSTON, PAYNE, STRAWN & SHAW, for appellant; JOHN D. BLACK and JOHN C. SLADE, of counsel.

JAMES C. McSHANE, for appellee.

MR. JUSTICE FITCH delivered the opinion of the court.

This is an appeal from a judgment for $9,500 in favor of appellee, hereinafter called the plaintiff, and against the appellant, hereinafter called the defendant, for personal injuries sustained by the plaintiff. The suit was originally brought against the Baltimore & Ohio Railroad Company, the Chicago Junction Railway Company and The Chicago River & Indiana Railroad Company. The suit was discontinued before the trial as to the Baltimore & Ohio Railroad Company, and at the close of the trial a verdict of not guilty was directed as to the Chicago Junction Railway Company.

The case was tried upon an amended declaration consisting of three counts. The first alleges that defendant owned and operated a railroad extending north and south, parallel with Loomis street, between 45th and 47th streets in Chicago, upon which there was a switch and switch-stand connecting the road with a certain side track; that plaintiff was a switchman employed by the Baltimore & Ohio Railroad Company; that said company operated certain of its trains over said railroad and past said switch and switch-stand, with the consent of the defendant; that it was the duty of the defendant to exercise ordinary care toward keeping the switch and switch-stand in a reasonably safe condition to enable the engines and trains of the Baltimore & Ohio Railroad Company to pass in safety, but that defendant negligently permitted said switch and switch-stand to become and remain in such an improper, insecure and defective condition that they were

likely to derail passing trains, which defendant knew, or by the exercise of ordinary care would have known, and that the plaintiff, through no want of ordinary care on his part, did not know of said condition, nor of the danger to which he was thereby exposed; that on August 31, 1908, in the discharge of his duty and with due care, the plaintiff was riding upon the front footboard of a B. & O. engine hauling a train on said railroad past said switch and switch-stand; that as a direct result of the defective condition of the switch and switch-stand the engine was derailed while passing the switch, and plaintiff was thrown under the engine and both his legs were broken.

The second count alleges the same general facts and that it was necessary to the reasonable safety of trains operated over said railroad, that a good and sufficient lock should be provided and used on the switch-stand in order to keep the switch in proper position, but the defendant negligently failed to provide and use a good and sufficient lock for that purpose, which facts were known to the defendant and unknown to the plaintiff.

The third count alleges that it was the duty of the defendant to exercise ordinary care toward keeping the switch closed and fastened, but that defendant negligently permitted the switch to become and remain unfastened and partially open, so that it was liable to derail engines and trains, which was known to the defendant and unknown to the plaintiff.

The evidence tended to prove the following facts. The defendant owned the tracks in question and the Baltimore & Ohio Railroad Company operated its trains over such tracks by agreement with the defendant. There were two tracks running north and south between 40th and 48th streets, the east track being the north-bound track, and the west the south-bound track. These tracks were used for freight switching purposes exclusively. Below 48th street they were connected with the tracks of the Chicago Terminal Trans-

fer Railroad Company, and at the northern end curved around to the east and joined the tracks of the Chicago Junction Railway Company, leading into the stock yards in Chicago. The Chicago, Milwaukee & St. Paul, the Indiana Harbor Belt, the Grand Trunk, the Pennsylvania and other railroad companies operated trains over defendant's tracks at a stipulated rate or charge for each car. About opposite 45th street there was a switch and a side track leading from the north-bound track east into the plant of the American Brick Company. The opening and closing of this switch was controlled by a switch-stand east of and opposite the points of the switch. These points were movable and connected by iron "tie rods" extending to the switch-stand. The switch-stand was made of iron and was about 2½ feet high. It consisted of a lantern, a movable target, and a lever or iron arm eighteen inches long, at one end of which was an iron ball weighing about ten pounds, and the other end of which was inserted in the mechanism for moving the switch points. The switch points were moved to the east or west by moving the lever from a horizontal position on one side of the stand through the air in a half circle to a corresponding position on the other side. When in proper position, the lever rested horizontally in one or the other of two iron forks, fastened one on either side of the switch-stand. At the top of each fork was a latch or "dog" so constructed that when the lever was pushed down into the fork the latch or "dog" would slip back over the lever and thus prevent the arm from being raised until the latch was released by a pedal attached to the switch-stand. There was also a padlock chained to one of the ties at the foot of the switch-stand for the purpose of fastening the lever in the fork and preventing anyone from releasing the "dog" by merely stepping on the pedal; but this lock had been broken several weeks prior to the accident, and was unfit for use. Between three and four o'clock of

the day preceding the accident, a Pennsylvania Railroad Company crew had switched a train of cars into the American Brick Company's yard, using for that purpose the switch and switch-stand in question. About noon the next day (the day of the accident) an engine of the Chicago Junction Railway Company, going north on the east main track, passed the switch, and its engineer and conductor testified that at that time the switch points were "lined up for the main track" that is, the switch was then closed and they passed in safety along the main track. At 1:40 p. m., a train of the Baltimore & Ohio Railroad Company came up on the east track from 48th street. This train consisted of a switch engine and a tender or tank, followed by a loaded coal car, twenty empty refrigerator cars and a caboose. The plaintiff was the head or front brakeman on this train, and for the purpose of seeing that the way was clear for the passage of the train, he stood upon the footboard in front of the engine. The plaintiff, the engineer and the fireman all testified that as they approached the switch, they looked at it and it appeared to them to be "lined for the main track," that is, the switch appeared to be closed. None of them looked at the target; but the evidence tended to show that weeds were growing around the target higher than the switch-stand, and that one approaching the stand along the tracks from the south could not see the target until nearly opposite; and if they had seen the target, it would have given them no warning of danger, for the reason that if the switch was closed, or nearly closed, the target would furnish no indication to the contrary. The speed of the train at that time, according to all but one of the witnesses who saw it immediately before the accident, was about eight or ten miles an hour. The one witness to the contrary testified that it appeared to him to be going twenty or twenty-five miles an hour. This witness was an employe of the brick company, who was then working in one of its sheds,

150 feet east of the switch. The engine had a single "pony truck," consisting of two small wheels under the front part of the engine, and six large drive wheels. The plaintiff and engineer testified that the wheels of the pony truck passed the switch along the main track, but that the drive wheels left the track near the switch points. The body of the engine "slewed around" to the east, so that when it was stopped, 100 or 150 feet north of the switch, the engine was pointing in a northwesterly direction, all of the west wheels being between the rails of the east main track and the east wheels being east of the east main track. At the first jolt of the engine along the ties, the plaintiff turned and grasped the hand rail above the footboard of the engine. He testified that almost at once the footboard doubled under the engine, carrying him down with it, but that he maintained his hold on the hand rail and was carried along with the engine until the front of the engine struck and plunged into a pile of clay at the right of the tracks, burying the plaintiff to the hips and breaking both his legs. It required forty minutes for men working with shovels to dig him out of the clay pile. Besides the engine, the tender or tank and the loaded coal car following it also left the track, and when the train stopped, one of the empty refrigerator cars was standing on the switch points. An examination of the switch at that time disclosed the fact that it was then wide open, and with the lever or ball-arm of the switch-stand resting on top of the latch or "dog," at an angle of twenty or twenty-five degrees above a horizontal position. Neither the switch nor the switch-stand was broken, except that a small piece of steel less than an inch in size was broken off the west switch point or rail.

Appellant's counsel state in their brief that the principal grounds urged for a reversal of the judgment are the following: First, the record fails to show that appellant was guilty of negligence; second, the court

erred in admitting evidence as to the existence of a custom among railroads with reference to the use of padlocks on switches; third, plaintiff was guilty of contributory negligence; fourth, the court erred as to certain instructions; and fifth, plaintiff's counsel was guilty of improper remarks in his argument to the jury. Neither appellant's counsel nor the counsel for appellee have discussed these alleged errors in the order or manner thus stated. Appellee's counsel has entirely ignored appellant's grounds as so stated, and has written an exhaustive brief and argument covering every possible point of the case, whether raised by appellant or not. This method of presenting the case for our consideration has greatly increased our labor and is very confusing. However, we shall follow as nearly as practicable the points raised as above outlined.

On the question of the defendant's negligence, appellant's counsel take the broad stand that the evidence of the witnesses who testified that the switch was apparently closed when the plaintiff's train approached it from the south is absurd and incredible. The evidence of plaintiff, the engineer and the fireman on the plaintiff's train as to this fact is corroborated by the evidence of the engineer and conductor of the Chicago Junction train which passed over the scene of the accident less than two hours before it occurred. These last mentioned witnesses were called by the defendant. The defendant also called a witness who testified that he had ''searched the train records for information as to trains operated over that north-bound track * * * just preceding the time of the accident,'' and that his search showed that no other train had passed over the switch in the meantime. Notwithstanding this evidence, offered by both sides, appellant's counsel insist that it is a practical impossibility for the switch to have been closed before the accident and open after the accident without wrecking the

switch or switch-stand, or both. On this theory, the defendant called three witnesses, experienced railroad men, who gave their opinions to the effect that the wheels of an engine could not thus "split a switch" without "buckling the tie rods;" and it clearly appeared that the tie rods were not "buckled." Another of defendant's witnesses, however, testified that there was a space or "play" between the points of the switch when fully opened and the rails of the main track amounting to four and one-half inches; that the flanges of the drive wheels were $1\frac{1}{8}$ inches in thickness; that the "gauge," or distance between the rails of the main track, "measured from the inside of the ball of the rail," was 4 feet $8\frac{1}{2}$ inches, and that the space between the inside of the flanges of the drive wheels is 4 feet $5\frac{3}{4}$ inches. The west switch point gradually curves to the east as it goes north, until it crosses the east rail. Hence, the space bounded by this curved rail on the west, the main track on the east, and the tie rod connecting the switch points on the south, is nearly in the shape of a right-angled triangle of which the tie rod forms the base, the east main track rail the altitude, and the curved switch rail the hypothenuse. The extreme width, therefore, of this triangular space is at the base of the triangle; and this extreme width, from the figures above given, is 4 feet and 4 inches. The width of the triangle becomes less, of course, at every point further north. From this evidence, it does not appear that there is anything impossible or even improbable in the theory of the plaintiff that the flange of the drive wheel was caught in the east switch point and that the switch was thus forced open by the immense weight of the passing engine. If the flange whose width was only $1\frac{1}{8}$ inches entered the east switch point in that manner, forcing the switch points that far to the west, there was still left a space of over three inches on the west side of the west switch point, between that point and

the west rail; and that space was more than enough to allow the flange of the opposite drive wheel to pass through without injuring the switch or buckling the tie rods.    Moreover, the fact that after the accident it was found that neither of the latches, or "dogs" above described was broken, tends to prove that while apparently closed, the switch was not completely closed, but partly open; for if it had been completely closed, the "dog" would have been broken in lifting the arm out of the fork in which it was designed to rest.    It is also a fair inference from this fact that the train crew which last used the switch (viz: the crew that used it the afternoon before) did not press down the arm into the fork and under the latch, but left it resting on top of the latch.    The evidence clearly shows that if the arm was in that position, the switch would appear to be closed while, in fact, it would be unfastened and in such a position as to be forced open by the passing flange of a car wheel.    One witness for defendant gave his opinion that the arm of the switch-stand could not be thus forced over through a half circle from one side to the other of the switch-stand without breaking the castings; but several other experienced railroad men testified that almost any condition might result from such an accident.    Unless we are to take the position that the five witnesses who saw the switch before the accident were all mistaken or wilfully testified falsely, and unless we are prepared to hold that the defendant's failure to provide a lock was not negligence under the facts shown in this case, the verdict of the jury must be sustained.    We see nothing in the evidence to justify us in taking such a position.    It was the duty of the defendant to exercise ordinary care to maintain its switches and switch-stands in reasonably safe condition; and it was a question of fact for the jury to decide whether the failure to lock the switch, or otherwise make it reasonably safe, was negligence.    So, also, under the circumstances shown regarding the operation of trains, the defend-

ant was liable for the negligence of the employes of the Pennsylvania Railway Company in operating the switch, if their negligence was the proximate cause of the accident.   Anderson v. W. C. S. R. R. Co., 200 Ill. 329; C. & G. T. Ry. Co. v. Hart, 209 Ill. 414.   In either view of the facts, the verdict is not manifestly contrary to the preponderance of the evidence.

It is urged that the kind and character of switch required upon a railroad is an engineering question; that a railroad company cannot be required to adopt any particular method or any special device in order to comply with its duty to use reasonable care to make its railroad and appliances reasonably safe.   There is no charge of negligence in *construction* in either the first or third counts of the amended declaration.   The first count alleges negligence in permitting the switch-stand to become and remain defective.   The third count alleges carelessness in operation of the switch.   The only count to which the argument thus made could have any possible application is the second count, which alleges negligence in failing to provide and use a sufficient lock.   But when the evidence is considered, even this possibility disappears; for all the witnesses agreed that there was a padlock chained to one of the ties, but that it had become broken and useless several weeks before the accident.   Such a condition can hardly be said to be a matter of engineering construction, or to present any engineering question.   The reasoning of the court in Kath v. E. St. Louis Sub. Ry. Co., 232 Ill. 126 and in C. W. & V. Coal Co. v. Brooks, 138 Ill. App. 34, is applicable to the facts of this case.   The question of the negligence of the defendant in this respect was a proper question for the jury on the facts presented.   C. & E. I. R. R. Co. v. Snedaker, 223 Ill. 395, 403.

It is next urged that it was error to admit evidence of a custom upon defendant's railroad and upon other railroads to provide and use a lock on switch-stands. In view of the uncontradicted fact that such a lock was

provided by the defendant for the stand in question, which it must be presumed was not merely ornamental but was intended to be used (Henderson v. C. B. & Q. R. R. Co., 73 Ill. App. 57, 62) the evidence regarding a custom to have such locks was unnecessary, and, in so far as it tended to prove a custom on other railroads, was probably inadmissible. C. R. I. & P. R. R. Co. v. Clark, 108 Ill. 113; Beidler v. Branshaw, 200 Ill. 425, 430. Evidence of a uniform custom as to the methods of doing work at the place of the injury has been held admissible as tending to prove negligence. Yeates v. I. C. R. R. Co., 241 Ill. 205; Campbell v. C. R. I. & P. Ry. Co., 243 Ill. 620. However, the court instructed the jury, at defendant's request, that in determining whether the defendant had used reasonable care to keep the switch in a reasonably safe condition for operation they ''should not take into consideration the testimony concerning the custom at other switch-stands and on other railroads of keeping switches locked or unlocked; the question for your decision in this respect is whether or not the particular switch-stand in question was a reasonably safe appliance and was kept and maintained with reasonable care.'' We think that any error of the court in admitting such evidence, if it was error, was cured by this instruction.

It is next contended that neither the negligence of the defendant in providing a broken lock, nor in leaving the switch partially unfastened, was the proximate cause of the accident. It is said that it was the plaintiff's duty to see that the switch was securely fastened, and that the evidence shows that it was the plaintiff's own neglect of duty in this respect, rather than the alleged negligence of the defendant, that proximately caused the accident. Without discussing this theory at length, it will suffice to say that under the evidence in this case, this was a question of fact for the jury and that in our opinion the evidence warranted the conclusion reached by the jury.

Complaint is made of the giving of one instruction and the refusal of three others. The objection made to the fourth instruction, in our judgment, arises from a misapprehension or misconstruction of the instruction. Appellant's counsel assume that it applies to the Chicago Junction switching crew, when, in fact, it clearly has reference to the crew which ''operated'' the switch the afternoon preceding the accident. Each of the three refused instructions contains an assumption of fact and all were, morever, sufficiently covered by other instructions.

We have given careful consideration to the argument of counsel concerning the remarks of plaintiff's counsel in his argument to the jury. While some of the language used by plaintiff's counsel is open to criticism, we do not think that what was said was sufficient to justify us in reversing the judgment for that reason alone. Counsel make no claim that the verdict was excessive.

The judgment of the Superior Court will be affirmed.

*Affirmed.*